## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INSIDE THEN OUT, LLC,<br><br>*Plaintiff*,<br>v.<br><br>PIETRA, INC.,<br><br>*Defendant*. | CIVIL ACTION NO. 25-cv-3997<br><br>COMPLAINT FOR BREACH OF CONTRACT, COPYRIGHT INFRINGEMENT, TRADEMARK INFRINGEMENT, FALSE ENDORSEMENT, AND TRADEMARK DILUTION<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Inside Then Out, LLC ("Plaintiff" or "ITO"), by its undersigned attorneys, for its Complaint against Defendant Pietra, Inc. ("Defendant" or "Pietra") hereby alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff ITO, a publisher of wellness journals, brings this civil action for breach of contract, trademark infringement, copyright infringement, false endorsement, and trademark dilution under federal, state, and/or common law against Defendant Pietra, a warehousing and fulfillment service, for its egregious failure to meet contractual obligations and unlawful conduct.

2.      Defendant's mismanagement and misreporting of ITO's inventory during the 2024 holiday season led to millions of dollars in lost sales for ITO, the misdirection of dozens of ITO's copyrighted journals, and severe damage to ITO's reputation as a quality seller of guided mental health journals.

3.      ITO brings this action to recover the millions of dollars in damages it has suffered, both in the form of lost sales and reputational harm that directly resulted from Pietra's

misconduct, as well as disgorgement of profits and attorney's fees under the Lanham Act, the

Copyright Act, and applicable state law.

## PARTIES

4.     Plaintiff Inside Then Out, LLC is a Florida company with its principal place of

business at 1435 Bayshore Dr, Englewood, FL 34223.  Plaintiff's principal, Nya Jones, resides in

Brooklyn, New York.

5.     Defendant Pietra, Inc. ("Pietra") is a Delaware corporation with its principal place

of business at 270 Lafayette Street, Suite 604, New York, New York 10012.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §

1121 and 28 U.S.C. §§ 1331, and 1338(a)-(b) because ITO's claims arise under the federal

Lanham Act and Copyright Act and because, pursuant to 28 U.S.C. § 1367, this Court has

supplemental jurisdiction over ITO's state law claims, which are substantially related to ITO's

federal Copyright Act and Lanham Act claims.

7.     This Court has personal jurisdiction over Defendant, and venue is proper in this

District pursuant to 28 U.S.C. § 1391(b) and (c), because ITO has been harmed in this District;

Defendant is located in this District; Defendant has conducted and is still conducting business in

this District; Defendant has infringed and/or is still infringing the ITO Trademarks and ITO

Copyrights (as those terms are defined below) in this District; and because Paragraph 12.7 of the

Contract (defined below), provides that "[a]ny action or proceeding arising from or related to

these terms must be brought in a federal or state court in New York, New York."

## FACTUAL BACKGROUND

### Inside Then Out and Its Popular Wellness Products

8.      ITO is a modern wellness company that empowers individuals to prioritize self-care.

9.      In 2020, in the midst of the COVID-19 pandemic, Nya Jones founded ITO to promote self-love, reflection, and personal growth through guided journals, beginning with the Better Every Day® journal.

10.      ITO's Better Every Day® journal quickly found meteoric success on the TikTok social media platform, and since 2020, has generated millions of dollars in revenue for ITO.

11.      ITO also offers a different wellness journal called Dig Deeper, as well as a mobile app offering enhanced journaling tools (*e.g.*, voice notes and photos), notepads, planners, sticky notes, and wellness candles, and creates content on social media that aligns with and supports its objectives of empowering people to prioritize self-care.

12.      ITO's wellness journals are guided journals.  They contain creative, insightful prompts for each day of the year.  ITO's thoughtful, creative, prompts are carefully crafted to spur journalers to interact with their own unique personal experiences in introspective and meaningful ways.

13.      ITO's journals are intended for use over the course of an entire calendar year, with different topics and prompts provided to journalers for use during specific days, weeks, and months.

14.      For example, as shown below, one of ITO's most popular products — the Better Every Day® journal — is organized into different chapters that correspond to different months, e.g., "Understanding Your Past" in April, "Love" in May, and "Relationships" in June.



15.     Because ITO's journals are intended for use over the course of an entire calendar year, which begins in January, consumer interest in ITO's journal products tends to peak during the "holiday" months of November, December and January.

16.     Most consumers purchase ITO's journals in November, December and January with the intention to start their year with the resolution of prioritizing self care through the consistent, intentional use of an ITO journal.

17.     Accordingly, ITO's monthly gross sales are typically highest during these "holiday" months of November, December and January.

18.     For example, in December 2023, ITO grossed over $1 million in sales of a single journal, the Better Every Day® journal, in a single month.

19.    ITO's journals are very successful, earning millions of dollars in annual revenue.

20.    Because ITO is a wellness company, ITO's business depends heavily on its online reputation as a company that genuinely cares about its customers.

21.    ITO's success also depends on the popularity and reach of its social media content, which has been viewed, shared, and liked by millions of social media users.

22.    ITO's TikTok content, for example, has received over 5 million likes, and several of its TikTok videos have been viewed by tens of millions of social media users.

23.    ITO's social media content is a key driver of ITO's business because ITO has had many videos go "viral" on TikTok and Instagram, allowing millions of users to interact with ITO's content.

24.    Many of ITO's social media content interactions are converted into actual sales of ITO's products because those interactions lead consumers directly to sales channels, e.g., ITO's TikTok shop and Instagram shop.

25.    ITO's social media content is not just a component of a marketing strategy; it is a critical aspect of ITO's product offerings.  ITO's modern, minimalist, soothing videos help users achieve the same wellness and intentionality goals that ITO's other products help them achieve.

26.    ITO's business depends heavily on social media platforms that allow ITO's content to be viewed, to be interacted with, and to gain traction and visibility through algorithmic amplification on social media.

27.    Algorithmic amplification is the extent to which a social media algorithm gives content greater reach than it would have gotten with some other neutral baseline algorithm. Many social media platforms use algorithmic amplification to "reward" posts that are popular by giving them increased visibility, creating a kind of "snowball" effect.  For example, TikTok

employs algorithmic amplification to reward popular content by further increasing the regularity and consistency in which that content appears on a user's feed. Conversely, social media platforms also "punish" account holders that sell products on social media platforms if they do not deliver those products in a timely manner.  In such cases, a social media account holder's account can be demoted or deactivated by the social media platform.

28.     Algorithmic amplification creates a strong incentive for account holders that sell products through the platform to either meet their delivery obligations, or deactivate advertising and sales until such time as they are able to do so.

29.     Under normal circumstances, ITO's business benefits tremendously from algorithmic amplification on social media because ITO's modern, minimalist, soothing content is regularly viewed by social media users, driving user engagement and further sales of ITO products.

30.     Through algorithmic amplification, millions of consumers in the U.S. and elsewhere have been exposed to ITO's INSIDE THEN OUT trademark, as well as its BETTER EVERY DAY and DIG DEEPER product trademarks.

31.     As a result of its success and broad exposure on social media, ITO has developed significant reputation and goodwill in its trademark rights in the marks INSIDE THEN OUT, BETTER EVERY DAY, and DIG DEEPER, which it protects through U.S. federal trademark registration nos. 6910572, and 7710242, as well as common law rights (together, the "ITO Trademarks").

32.     ITO protects its trademarks, in part, by controlling the quality of the goods and services that are offered under the ITO Trademarks.

33.    ITO achieves this, for example, by developing and sending packaging instructions to any third parties responsible for packaging and sending products to fulfill sales.

34.    ITO also achieves this by developing and disseminating shipping guidelines, which are available on its website.  *See* https://www.insidetheout.com/policies/shipping-policy.

35.    ITO also protects its guided journals as creative works through copyright registrations, including U.S. Copyright Registration Nos. TX0009130419 and TX0009177953 for the Better Every Day journal and Dig Deeper journal, respectively ("ITO Copyrighted Works").

**Defendant Pietra**

36.    Defendant Pietra is a company that offers an e-commerce platform intended for entrepreneurs and small businesses that want to launch and scale their brands.

37.    Defendant markets "turnkey solutions to move faster, save money and build a more profitable business" on its website available at pietrastudio.com (as shown below):



38.    On its website, Pietra purports to offer a comprehensive e-commerce service for brands that includes everything from product sourcing and order fulfillment to social media expertise in hiring influencers and making content (as shown below):



39.     As part of these offerings, Pietra will take on the responsibility of connecting a startup's product inventory with its online sales platform.

40.     For example, Pietra will connect with a startup customer's Shopify account, allowing it access to the orders that come in from Shopify, and will also take custody of product inventory in order to utilize that inventory to fulfill online orders.

41.     As of 2025, Pietra is valued at $75 million, with a reported 210% revenue growth from January to April of 2025.  *See* https://ceo-mag.com/nyc-creator-economy-startup-pietra-raises-15m-champion-creators-streamline-entrepreneurship.

42.     Pietra is backed by several large investors, including Silicon Valley investment firm Andreesen Horowitz or "A16z."  *See* https://a16z.com/portfolio/.

43.     Pietra's officers and board of directors are comprised of multiple, sophisticated investors in software technologies, including investors from Founders Fund and M13.

44.     On information and belief, Pietra is familiar with social media-driven sales and marketing as well as the algorithmic amplification that allows those online businesses to thrive.

**Pietra's Contract with ITO**

45.    On March 16, 2023, ITO engaged Pietra to provide services to ITO by executing the Pietra Fulfillment Services Agreement (the "Contract").

46.    Paragraph 3.1 of the Contract requires Pietra to do the following:

- B. Provide storage facilities for the Product inventory ("Inventory") in Pietra's warehousing facilities (" Warehouse ")…

- C. Upon notification by the Company of a purchase of Products by a customer, Pietra will pick and package the Products from the available inventory, and ship such Products directly to the customer (" End-User ")…

- F. Pietra will process, package and ship all Product orders in accordance with Pietra Legal Policies…

- G. Pietra will maintain monthly ledger summaries of all orders shipped and received, which shall be made available to the Company through Pietra's software platform."

47.    Paragraph 11 of the Contract titled "Limitation on Pietra Liability" provides:

**11. LIMITATION ON PIETRA LIABILITY**

**11.1 NO LIABILITY FOR CONSEQUENTIAL OR INDIRECT DAMAGES THIRD PARTY LIABILITY.** EXCEPT FOR LIABILITY FOR INDEMNIFICATION AND LIABILITY FOR BREACH OF CONFIDENTIALITY, NEITHER PIETRA NOR ITS REPRESENTATIVES IS LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, OR DAMAGES FOR LOSS, LOSS OF PROFITS, REVENUE, DATA OR USE, INCURRED BY COMPANY OR ANY THIRD PARTY, WHETHER IN AN ACTION IN CONTRACT OR TORT, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAS BEEN DISCLOSED IN ADVANCE BY PIETRA/ OR COULD HAVE BEEN REASONABLY FORESEEN BY PIETRA, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE. OTHER THAN AS SET FORTH BELOW, IN NO EVENT SHALL PIETRA'S LIABILITY UNDER THIS AGREEMENT EXCEED THE MONIES PAID OR PAYABLE BY COMPANY TO PIETRA IN THE PRECEDING 12 MONTHS OF THE EVENT EXCLUDING CARRIER FEES OR OTHER THIRD PARTY FEES ("DAMAGES CAP"). PIETRA MUST BE NOTIFIED WITHIN FIVE (5) DAYS AFTER ANY UNAUTHORIZED TRANSACTION OR COMPANY WAIVE ALL DAMAGES FROM PIETRA.

48.     Paragraph 12.7 of the Contract states that it "shall be construed in accordance with the applicable laws of the State of New York."

49.     The laws of the State of New York provide, *inter alia*, that a limitation of liability provision, such as the provision contained in Paragraph 11 of the Contract, is not enforceable as a defense to a breach of contract claim where the breaching party is grossly negligent.

50.     The Contract does not contain any terms or provisions that convey an express intellectual property license from ITO to Pietra, or otherwise address Pietra's intellectual property rights in its journal products.

51.     Pietra also has fulfillment Service-Level Agreements regarding delivery times. Pietra promises that orders are processed and shipped within 2 business days for Standard Fulfillment, processed and shipped within 1 business day Expedited Fulfillment, and that once processed, orders are handed off to the shipping carrier within 1 business day.

**ITO's Implied Intellectual Property Licenses**

52.     On April 23, 2023, Pietra received its first shipment of products from ITO.

53.     Although Pietra did not have an express license to utilize ITO's intellectual property for the purpose of selling ITO journals, the parties' course of dealings clearly demonstrates that ITO gave Pietra an implicit license to utilize ITO Trademarks and ITO Copyrights for the purpose of fulfilling Pietra's obligations under the Contract.

54.     Thus, whenever ITO shipped products to Pietra, it conveyed an implied license to Pietra to use its intellectual property in those specific products, namely, its copyright and trademark rights, for the purposes of fulfilling the contractual relationship, *i.e.*, for selling those goods.

55.     Specifically, by shipping these products to Pietra, ITO conveyed an implied trademark license to Pietra to use the ITO Trademarks, namely, INSIDE THEN OUT, BETTER EVERY DAY, and DIG DEEPER, in connection with the storage, fulfillment, and sale of ITO products.

56.     Moreover, by shipping these products to Pietra, ITO conveyed an implied copyright license to Pietra to use the ITO Copyrighted Works, including but not limited to the copyrights in the Better Every Day and Dig Deeper journals, in connection with the storage, fulfillment, and sale of ITO products.

57.     These implied intellectual property licenses contained implicit limitations, namely, limitations that prohibited the use of ITO's intellectual property beyond the scope of the commercial relationship contemplated in the Contract.

58.     For example, these implied intellectual property licenses prohibited Pietra from giving away ITO products for free, or from photocopying ITO products to make duplicates.

59.      Notably, ITO's implied intellectual property licenses were necessarily limited to actual sales or distributions through ITO's Shopify account, and thus excluded any and all distributions and sales to those who did not actually order the product(s) being shipped.

**Pietra's Gross Negligence**

60.     Between at least March 2024 and January 2025, Pietra engaged in series of acts that caused significant financial harm to ITO.

61.     Pietra's misconduct first became apparent between November 27, 2024 and December 15, 2024, when a wave of significant fulfillment delays from Black Friday orders led ITO customers to complain about not receiving updates on their orders for almost two weeks.

62.     Pietra's missteps became even more apparent between December 17, 2024 and January 8, 2025, when ITO learned of a second wave of significant fulfillment delays, giving rise to additional customer complaints and auto-cancellation of orders on TikTok shop due to failure to meet fulfillment times.

63.     On January 1, 2025, the Pietra system showed that the Better Every Day Journal was sold out, causing ITO to set the Better Every Day Journal to pre-order on TikTok Shop, scale back Meta ads, and turn off TikTok shop ads.

64.     On January 2, 2025, ITO requested a count of Better Every Day safety stock and gave instructions for pre-orders, thinking these were sold out.  Laura from Pietra informed them there were no units of safety stock—this turned out to be grossly inaccurate.

65.     On January 6, 2025, Pietra's system began showing that Dig Deeper Journals were sold out. This caused ITO to set the Dig Deeper Journal to pre-order on TikTok Shop, scale back Meta ads, and turn off TikTok shop ads.

66.     On January 15, 2025, a representative of ITO reached out to Pietra again for an inventory count. Laura from Pietra said they would get a count the following day.  However, on January 16, 2025, Pietra did not provide ITO with the requested inventory count.

67.     On January 17, 2025, ITO decided to discontinue its relationship with Pietra.  ITO informed Pietra of its decision that same day via email.

68.     On January 21, 2025, ITO still had not received an inventory count, so a representative of ITO followed up again with Pietra regarding this request.

69.     On January 24, 2025, representatives of ITO and Pietra joined a call to discuss the status of these ongoing business interruptions.

70.     During this call, it was confirmed by a Pietra representative that Pietra had been miscounting inventory for many, if not all, of its customers for at least 10 months, *i.e.*, since March 2024.

71.     Also during the call, Pietra finally provided ITO with the inventory count that ITO had requested on January 2, 2025, January 15, 2025, and January 21, 2025.  In doing so, Pietra disclosed for the first time that there were 15,000 Dig Deeper journals and 770 units of Better Every Day journals in inventory that had not been accounted for in Pietra's system.

72.     Specifically, a representative of Pietra confirmed that they had received a shipment of 15,000 Dig Deeper journals in March 2024, but those goods were never "allocated into inventory."  No explanation was given for the 770 units of unaccounted for Better Every Day journals.

73.     Pietra's representative indicated that the reason for this was that when Pietra "transitioned away from the original receiving system" they "lost what was referred to as the components table, which is where all products went when they showed up as products available for setup back in the day."

74.     In effect, during this call, Pietra admitted that ***Pietra had lost all data showing the inventory that it was supposedly managing for its customers.***

75.     Pietra did not rectify this grievous error for at least nine months.

76.     Also during this call, a representative of ITO indicated that, from October 2024 through January 2025, ITO was being charged the same fulfillment fees every month, even though inventory was being depleted.  For example, in January 2025, even though Better Every Day® and Dig Deeper® journals were showing as sold out, ITO was charged for the storage of 148 pallets of journals, far exceeding what was available for ITO to sell.

77.     Pietra's representative responded that these overcharges were "part of our internal realignment from a leadership perspective as our previous inventory manager was doing storage audits"; that Pietra had learned "in the last 2 or 3 weeks of December that she was not updating things like that" so they "had to unfortunately move forward with someone else in that role"; and that Pietra was "evaluating the last five months of storage charges to see what has been updated versus what hasn't to make things right for all of our brands in that respect."

78.     In effect, during this call, Pietra admitted that it had been overcharging all of its customers on inventory warehousing fees—including ITO—for at least five months.

79.     Pietra's representative concluded the call, admitting that ITO had been "dealt a really rough hand of cards" by Pietra, apologizing, stating that ITO "deserved better," and characterizing Pietra's own mishandling of ITO's business as "chaos" that Pietra would try to "minimize… moving forward."

80.     Even after Pietra admitted to its chaotic and grossly negligent business practices, causing ITO to move to a different fulfillment provider, Pietra made further mistakes during that transition, which harmed ITO's business.

81.     First, Pietra agreed to ship all ITO inventory to ITO's new fulfillment provider within a one-week time frame, but this process took several weeks longer than Pietra promised it would, thereby harming ITO's sales opportunities and increasing ITO's inventory storage costs.

82.     Second, Pietra made additional inventory count mistakes during this process, *i.e.*, Medium Boxes were not included in initial shipments, which oversights had a further negative impact on ITO's sales and shipping times.

83.     Pietra's failure to promptly and properly transition ITO's fulfillment service provider caused additional harm to ITO, its business, and its reputation.

**Pietra's Infringement of ITO's Intellectual Property**

84.     In addition to the grossly negligent conduct  described above, Pietra misdirected multiple orders to customers in a manner that exceeded the scope of the implied intellectual property licenses that ITO granted to Pietra, and thus infringed Pietra's intellectual property rights.

85.     Between December 17, 2024 and January 5, 2025, a high number of customers received incorrect orders or extra items.

86.     For example, one customer ordered a Better Every Day journal but received a Dig Deeper journal (per this customer's email, reproduced below):



87.     Another customer ordered a Daily Planner but received a Better Every Day journal (per this customer's email, reproduced below):

Hello,

I ordered the Daily Planner, but received the Better Every Day journal.

What are next steps for me to receive to correct product?

Thanks!
Desarae

88.     Such misdirected journals were sent in violation of the implied intellectual property licenses that ITO granted to Pietra when it allowed Pietra to store, ship, and sell ITO's journal inventory.

89.     ITO provided its journal inventory to Pietra for the express purpose of fulfilling inventory orders on Shopify.  ITO's instructions were simple and obvious: Pietra was to use ITO's copyrighted inventory solely to fill orders.

90.     By failing to fill those orders correctly, Pietra exceeded the scope of ITO's implied licenses, thereby infringing ITO's exclusive distribution rights in at least ITO's Better Every Day and Dig Deeper journals.

91.     Pietra also infringed the ITO Trademarks, and specifically, the INSIDE THEN OUT mark, as well as the BETTER EVERY DAY or DIG DEEPER mark (depending on which specific journal was distributed) by distributing those goods to customers outside of normal quality controls and distribution parameters, including but not limited to late deliveries that impacted the overall usability of the product during a calendar year, and by misdirecting journals to customers that did not order them, in violation of ITO's packaging instructions, shipping guidelines and quality standards for its products.

92.     Pietra has also used and continues to use the INSIDE THEN OUT trademark on its website with a misleading quotation ("Misleading ITO Quotation"), as shown below:



93.     The Misleading ITO Quotation is misleading because it is falsely attributed to "Inside Then Out," i.e., a company (not any specific individual that could utter such a statement), and also because no one at ITO neither made nor approved this statement.

94.     The Misleading ITO Quotation is also misleading because it suggests that Pietra "helped Inside Then out cut their product costs" which, in view of the above facts, is patently false and misleading.

95.     For example, as described above, Pietra's inventory accounting blunders and misreporting of ITO product inventory levels in Pietra's own facilities caused ITO to order more

products than it needed, to incur unnecessary inventory costs to store those products, and to pay inventory storage costs for products that were not listed in Pietra's inventory as available to sell.

### PIETRA'S WILLFUL MISCONDUCT

96.    On April 9, 2025, ITO wrote to Pietra's Chief Executive Officer, via email, to object to its various misconduct, seeking to resolve this matter amicably through a demand that ITO be compensated for the severe harm that Pietra caused ITO.

97.    ITO's letter identified the various misconduct alleged above, including but not limited to Pietra's ongoing use of ITO's INSIDE THEN OUT trademark on its website at pietrastudio.com without authorization, and in a misleading fashion.

98.    ITO's letter also demanded that Pietra remove the Misleading ITO Quotation from its website.

99.    On April 24, 2025, having received no reply, ITO forwarded a copy of its letter to Pietra at its physical address in New York, New York.

100.    Per the United States Postal Service return receipt, this hard copy of ITO's April 9, 2025 letter was received by Pietra on April 28, 2025.

101.    To date, Pietra has not responded to ITO's April 9, 2025 letter.

102.    Moreover, Pietra has neither acknowledged nor discontinued its use of ITO's INSIDE THEN OUT trademark or the Misleading ITO Quotation on its website, and continues to mislead the public to believe that ITO endorses Pietra's products and services when that is clearly not the case.

103.    On information and belief, Pietra has ignored ITO's concerns, in the hope that ITO will not pursue the matter any further.

104.    Pietra's actions have left ITO no choice but to seek judicial relief through this action.

## INJURY TO THE PUBLIC AND ITO

105.    Pietra's use of the ITO Trademarks is likely to cause confusion, mistake, and deception as to the source, origin, sponsorship, and/or endorsement of Pietra's products and services, and is likely to falsely suggest a sponsorship, connection, or association between Pietra, its products, its services, and/or its commercial activities with ITO and/or its corporate identity.

106.    Pietra's unauthorized use of the ITO Trademarks has damaged and irreparably injured and, if permitted to continue, will further damage and irreparably injure ITO, its reputation and goodwill, the ITO Trademarks, the ITO corporate identity, and the public's interest in being free from confusion.

107.    Pietra knew, or should have known, that its use of the ITO Trademarks violates ITO's rights in the ITO Trademarks.  As a result, Pietra has acted knowingly, willfully, in reckless disregard of ITO's rights, and in bad faith.

108.    Pietra's other misconduct, as described above, has also caused grievous harm to ITO and the public.

109.    But-for Pietra's disruptions to the traction of ITO's content on TikTok, such content would have enjoyed normal algorithmic reach and monetization.

110.    On information and belief, this normal algorithmic reach and monetization would have allowed ITO content to reach millions more viewers and potential customers, and accordingly, would have earned ITO millions of dollars in additional revenue than ITO actually earned.

111.    On information and belief, Pietra is familiar with algorithmic amplification on social media and was aware of the harm that its actions could and would cause to ITO.

112.    Pietra's misconduct also caused harmed ITO's reputation, as evidenced by the dozens of complaints that ITO received.

113.    Pietra's misconduct also caused harm to these consumers, as shown in the above examples.

114.    Such reviews and negative feedback severely harmed the ITO brand by creating negative brand perceptions and associations due to late deliveries, canceled orders, and incorrect orders caused by Pietra's gross negligence (as described further below).

115.    As a result of Pietra's misconduct described herein, ITO has suffered actual damages to be proven at trial.

116.    ITO no adequate remedy at law for at least Pietra's ongoing misuse of the ITO Trademarks, namely the INSIDE THEN OUT mark, which constitutes false endorsement.

**FIRST CLAIM FOR RELIEF**
**<u>Breach of Contract Under New York Law</u>**

117.    ITO repeats and realleges each and every allegation set forth above as though fully set forth herein.

118.    Pietra was contractually bound to provide fulfillment center and related services to ITO under the Pietra Fulfillment Services Agreement executed March 16, 2023.

119.    ITO has performed all of its obligations under the Pietra Fulfillment Services Agreement.

120.    Pietra breached, among others, Paragraphs 3.1(B), (C), (F), and (G) of the Pietra Fulfillment Services Agreement, which provisions required Pietra to provide storage facilities for

ITO products; pick and package ITO products; process and ship ITO product orders; and maintain records of orders and inventories.

121.    Pietra's breaches of the Pietra Fulfillment Services Agreement caused actual damages and other harm  to ITO as described herein.

122.    Pietra is liable for damages flowing from its breaches of the Pietra Fulfillment Services Agreement in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**Copyright Infringement Under**
<u>**Section 501 of the Copyright Act, 17 U.S.C. § 501**</u>

123.    ITO repeats and realleges each and every allegation set forth above as though fully set forth herein.

124.    ITO owns valid and subsisting copyright registrations in its BETTER EVERY DAY and DIG DEEPER journals, *i.e.*, the ITO Copyrighted Works.

125.    ITO has not authorized Pietra, its employees, its users, or its affiliates to distribute ITO Copyrighted Works except pursuant to customer orders that Pietra agreed to process for ITO under the Contract.

126.    Nevertheless, Pietra distributed the ITO Copyrighted Works other than pursuant to customer orders for ITO products, namely, by sending ITO's Better Every Day® and Dig Deeper® journals to recipients that never ordered those journals.

127.    Pietra, through its employees, contractors, and users, has directly infringed ITO's Copyrighted Works by distributing those works beyond the scope of the implied licenses that ITO granted to Pietra when it delivered those works, and did so with actual notice of ITO's copyright claims.

128.    Pietra's infringement was at all times willful and intentional.

129.    Pietra is secondarily liable for any direct infringement by its employees, contractors, and/or affiliated entities.

130.    ITO has suffered actual harm, reputational harm, and has incurred significant costs as a direct and proximate result of Pietra's direct and secondary infringement.

**THIRD CLAIM FOR RELIEF**
**Trademark Infringement Under**
**Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)**

131.    ITO repeats and realleges each and every allegation set forth above as though fully set forth herein.

132.    Without ITO's consent, Pietra used and continues to use in commerce reproductions, copies, and colorable imitations of the ITO Trademarks in a manner which is likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

133.    ITO has suffered actual harm, reputational harm, and has incurred significant costs as a direct and proximate result of Pietra's infringement.

**FOURTH CLAIM FOR RELIEF**
**False Endorsement Under**
**Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)**

134.    ITO repeats and realleges each and every allegation set forth above as though fully set forth herein.

135.    Pietra's misuse of the ITO Trademarks, as described above, is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of Pietra, its products and services, and/or its commercial activities by or with ITO, its ITO Trademarks, and the ITO corporate identity, and thus constitute trademark infringement, false designation of

origin, passing off, false endorsement, and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

136.    ITO has suffered actual harm, reputational harm, and has incurred significant costs as a direct and proximate result of Pietra's infringement.

## FIFTH CLAIM FOR RELIEF
### Trademark Infringement Under New York Common Law

137.    ITO repeats and realleges each and every allegation set forth above.

138.    Pietra's actions described above create the impression in the mind of the public that ITO is responsible for the quality and performance of Pietra's products/services or is otherwise affiliated, connected, or associated with Pietra, its products/services, and/or its commercial activities and thus Pietra's acts constitute common-law trademark and trade name infringement of ITO's proprietary rights in its ITO Trademarks and misappropriation of ITO's goodwill in those marks, as provided for in N.Y. Gen. Bus. Law § 360-o.

139.    ITO has suffered actual harm, reputational harm, and has incurred significant costs as a direct and proximate result of Pietra's infringement.

## SIXTH CLAIM FOR RELIEF
### Trademark Dilution Under N.Y. Gen. Bus. Law § 360-l

140.    ITO repeats and realleges each and every allegation set forth above.

141.    The ITO Trademarks are inherently distinctive because they are suggestive, arbitrary and/or fanciful as applied to ITO's products and/or services and the mark is commercially strong.

142.    The ITO Trademarks are widely recognized marks in New York.

143.    The ITO Trademarks are extremely strong marks.

144.    Pietra's unauthorized use of the ITO Trademarks dilutes the strength of the ITO Trademarks, resulting in damage to ITO and the substantial business and goodwill symbolized by the ITO Trademarks in violation of New York General Business Law § 360-l.

145.

## PRAYER FOR RELIEF

WHEREFORE, ITO requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

1)    ***For Count I, Breach of Contract under New York Law***

a.    That an Order be entered requiring Pietra to pay damages to Plaintiff for its breaches of its contractual obligations in an amount to be determined at trial.

2)    ***For Count II, Copyright Infringement Under 17 U.S.C. § 101 et seq.***

a.    That an Order be entered against Pietra for violating the provisions of the Copyright Act, 17 U.S.C. § 101 *et seq*. by infringing Plaintiffs' ITO Copyrights in its journals;

b.    That an Order be entered against Defendant Pietra in favor of Plaintiff for such damages as Plaintiff has sustained in consequence of Pietra's infringement of Plaintiff's copyrights in an amount to be determined at trial;

c.    That an Order be entered compelling Defendant Pietra to account for and/or disgorge all gains, profits and advantages derived by Pietra by its infringement of Plaintiff's copyrights or such damages supported by the provisions of the Copyright Act, 17 U.S.C. § 101 *et seq*.;

     d.     That an Order be entered pursuant to 17 U.S.C. § 504 awarding enhanced statutory damages for each infringement of Plaintiff's copyrighted works;

     e.     That an Order be entered granting injunctive relief pursuant to 17 U.S.C. § 502 preventing and restraining infringement of Plaintiff's copyrights by Ordering Defendant Pietra, its agents, or anyone working for, in concert with or on behalf of Pietra not to use, publish, distribute, or in any way disseminate Plaintiff's copyrighted works;

     f.     That an Order be entered pursuant to 17 U.S.C. § 503 for the impounding and/or destruction of all materials used in the violation of Plaintiff copyright owner's exclusive rights and any other articles by means of which such copies may be reproduced;

     g.     That an Order be entered requiring Pietra to pay ITO its costs and attorneys' fees in this action pursuant to 17 U.S.C. § 505;

**3)**     ***For Counts III, IV, V, VI Under Title 15 and Applicable State Law***

     a.     That an Order be entered against Pietra for violating 15 U.S.C. § 1114 by making unauthorized use of the ITO Trademarks in a manner that creates a likelihood of consumer confusion, infringing ITO's registered trademark rights;

     b.     That an Order be entered against Pietra for violating 15 U.S.C. § 1125(a)(1)(A) by making unauthorized use of the ITO Trademarks in a manner that creates a likelihood of consumer confusion, infringing ITO's common law trademark rights;

c.      That an Order be entered against Pietra for violating 15 U.S.C. §
1125(a)(1)(A) by making unauthorized use of the ITO Trademarks in a manner
that creates a likelihood of consumer confusion, constituting false endorsement;

d.      That an Order be entered against Pietra for violating New York
law by making unauthorized use of the ITO Trademarks in a manner that creates a
likelihood of consumer confusion, constituting common law trademark
infringement;

e.      That an Order be entered against Pietra for violating N.Y. Gen.
Bus. Law § 360-l by making unauthorized use of the ITO Trademarks in a manner
that tarnishes, and dilutes the distinctiveness of the ITO Trademarks;

f.      That an Order be entered against Defendant Pietra in favor of
Plaintiff for such damages as Plaintiff has sustained in consequence of Pietra's
violations of 15 U.S.C. §§ 1114, 1125(a), including Plaintiff's lost profits,
disgorgement of Pietra's profits, and corrective advertising expenses;

g.      That an Order be entered for preliminary and permanent injunctive
relief prohibiting Pietra, its agents, or anyone working for, in concert with or on
behalf of Pietra from engaging in false endorsement and/or violating 15 U.S.C. §
1125(a), which relief includes but is not limited to removal of all infringing
content from Pietrastudio.com, removal and destruction of false or misleading
advertisements pursuant to 15 U.S.C. § 1118, and corrective advertising to
remedy the effects of Pietra's false endorsement;

h.      That an Order be entered requiring Pietra to correct any erroneous
impression persons may have derived concerning ITO's endorsement of Pietra,

including without limitation the placement of corrective advertising and providing written notice to the public;

       i.     That an Order be entered requiring that all of Pietra's misleading and deceptive materials be removed and destroyed pursuant to 15 U.S.C. § 1118;

       j.     That an Order be entered against Pietra to pay ITO its costs and attorneys' fees in this action pursuant 15 U.S.C. §§ 1116, 1117(a).

       k.     That an Order be entered against Pietra to pay all profits derived from and/or all damages suffered by ITO by reason of Pietra's wrongful use, display and sale of goods and services in a manner that tarnished, and/or diluted the distinctiveness of the ITO Trademarks, and that such amounts be trebled, and that reasonable attorneys' fees be awarded, in view of Pietra's knowing, willful, and/or bad faith conduct pursuant to N.Y. Gen. Bus. Law § 360-m.

       l.     That an Order be entered against Pietra to pay all profits derived from and/or all damages suffered by ITO by reason of Pietra's infringement of ITO's trademark rights under New York State common law.

       m.     That an Order be entered requiring Pietra to pay ITO punitive damages in an amount to be determined due to the foregoing willful acts of Pietra.

4)     ***For All Counts***

       a.     That Plaintiff be granted prejudgment and post-judgment interest;

       b.     That an Order be entered granting such other and further relief as the Court may deem appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, ITO respectfully demands a trial by jury on all issues properly triable by a jury in this action.


Date:  July 18, 2025

Respectfully submitted,
/s/ Samuel V. Eichner
Samuel V. Eichner
sam.eichner@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 318-3139

*Attorneys for Petitioner*
*Inside Then Out, LLC*